**No. 25-4078**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

R.W,

*Plaintiff-Appellant,*

v.

COLUMBIA BASIN COLLEGE, *et al.*,

*Defendants-Appellees.*

On Appeal from the
United States District Court
For the Eastern District of Washington
No. 4:18-CV-05089-MKD
Honorable Mary K. Dimke

**APPELLEES' ANSWERING BRIEF**

NICHOLAS W. BROWN
Attorney General

CARL P. WARRING
Special Assistant Attorney General
818 West Riverside, Suite 250
Spokane, WA 99201
(509) 455-5200
cwarring@ecl-law.com
*Attorney for Defendants-Appellees*

Table of Contents

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTIONAL STATEMENT ....................................................4

III.    ISSUES PRESENTED ........................................................................4

    1.   Whether the district court properly decided R.W.'s expression of homicidal ideation constituted an unprotected true threat under the First Amendment where it was objectively reasonable for college administrators to interpret his statements to a designated crisis responder as a serious expression of intent to harm or assault. .....................................................................................4

    2.   Whether the district court properly found that no retaliatory animus existed where the district court identified specific witness testimony and exhibits to support its finding and R.W. has not demonstrated the finding was clear error.........................5

    3.   Whether the district court properly determined the student speech doctrine's substantial disruption test precludes R.W.'s First Amendment retaliation claim where R.W.'s homicidal ideation posed an identifiable and credible threat of violence to the college community and the steps taken to mitigate the threat of violence were reasonable. ......................................................5

IV.     STATEMENT OF THE CASE ...........................................................5

    A.  Substantive Facts..........................................................................5

    B.  Procedural History.......................................................................11

V.      SUMMARY OF THE ARGUMENT ...............................................12

VI.     STANDARDS OF REVIEW............................................................14

VII.    ARGUMENT....................................................................................16

A. The District Court Properly Decided R.W.'s Expression of Homicidal Ideation Constituted an Unprotected True Threat Under the First Amendment ......................................................17

    1. The district court applied the correct legal standard for a true threat analysis in a civil case ...............................................18

    2. R.W. has failed to demonstrate the district court's factual findings constitute clear error .............................................23

B. The District Court Properly Found that No Retaliatory Animus Existed ...................................................................................26

C. The District Court Properly Determined the Student Speech Doctrine's Substantial Disruption Test Precludes R.W.'S First Amendment Retaliation Claim ...................................................29

    1. The district court properly concluded that the student speech doctrine's substantial disruption test applies to college campuses when identifiable and credible threats of violence exist ...................................................................................30

        a. R.W. relies on inapposite cases to attack the district court's conclusion .........................................................301

        b. The weight of authority favors applying the substantial disruption test in the college setting ..............................305

    2. The district court correctly determined that the evidence at trial satisfied the requirements of the substantial disruption test ...................................................................................37

VIII. CONCLUSION ................................................................................38

FORM 17. STATEMENT OF RELATED CASES. ................................40

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS .................41

# Table of Authorities

**Cases**                                                                      **Page(s)**

*Allen v. Iranon*,
   283 F.3d 1070 (9th Cir. 2002) .................................................................. 15

*Anderson v. City of Bessemer*,
   470 U.S. 564 (1985) ............................................................................... 15

*Asarco LLC v. Atl. Richfield Co., LLC*,
   975 F.3d 859 (9th Cir. 2020) .................................................................. 15

*Blair v. Bethel Sch. Dist.*,
   608 F.3d 540 (9th Cir. 2010) .................................................................. 16

*Boquist v. Courtney*,
   32 F.4th 764 (9th Cir. 2022).............................................................. 18, 19

*Castle v. Marquardt*,
   632 F. Supp. 2d 1317 (N.D. Georgia 2009) ............................................. 36

*Cheairs v. City of Seattle*,
   145 F.4th 1233 (9th Cir. 2025) ................................................................ 26

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) .............................................................. 22, 23

*Corales v. Bennett*,
   567 F.3d 554 (9th Cir. 2009) .................................................................. 24

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003) .............................................................. 28, 29

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ........................................................................... 18, 21

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) .................................................................. 37

*Democratic Nat'l Comm. v. Reagan*,
  904 F.3d 686 (9th Cir. 2018) .......................................................... 15

*Doe v. Rector & Visitors of George Mason University*,
  132 F. Supp. 3d 712 (E.D. Va. 2015) ........................................... 36

*Doe v. Valencia College*,
  903 F.3d 1220 (11th Cir. 2018) .................................................... 35

*Elonis v. United States*,
  575 U.S. 723 (2015) ...................................................................... 20

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021) .......................................................................... 15

*Healy v. James*,
  408 U.S. 169 (1972) ................................................................ 33, 34

*Hunt v. Bd. of Regents of Univ. of New Mexico*,
  792 Fed. Appx. 595 (10th Cir. 2019) ........................................... 34

*Husain v. Olympic Airways*,
  316 F.3d 829 (9th Cir. 2002) ....................................... 15, 24, 37

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*,
  993 F.2d 386 (4th Cir. 1993) ....................................................... 36

*Keefe v. Adams*
  840 F.3d 523 (8th Cir. 2016) ....................................................... 35

*Kincaid v. Gibson*,
  236 F.3d 342 (6th Cir. 2001) ....................................................... 37

*Kirola v. City & Cnty. of San Francisco*,
  860 F.3d 1164 (9th Cir. 2017) ..................................................... 15

*Kohler v. Presidio Int'l, Inc.*,
  782 F.3d 1064 (9th Cir. 2015)...................................................... 15

*LaVine v. Blaine Sch. Dist.*,
  257 F.3d 981 (9th Cir. 2001) ................................................................ 1

*Lentini v. Cal. Ctr. For the Arts*,
  370 F.3d 837 (9th Cir. 2004) ............................................................ 15

*Lingo v. City of Salem, No. 14-35344*,
  2016 U.S. App. LEXIS 14535 (9th Cir. 2016) ........................................ 22

*McNeil v. Sherwood Sch. Dist. 88J*,
  918 F.3d 700 (9th Cir. 2019) ...................................................... 16, 29

*Murakowski v. University of Delaware*,
  575 F. Supp. 2d 571 (D. Del. 2008) .......................................... 36

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) .................................................... 16, 26

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
  960 F.3d 603 (9th Cir. 2020) ................................................ 14, 26

*Oyama v. University of Hawaii*,
  813 F.3d 850 (9th Cir. 2015) ................................................ 32, 33

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) .................................... 19, 20, 21

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) .......................................... 16, 28

*Papish v. Board of Curators of University of Missouri*,
  410 U.S. 667 (1973) ...........................................................32

*Petersen v. State*,
  100 Wash. 2d 421 (1983) ............................................ 23

*Rutan v. Republican Party of Illinois*,
  497 U.S. 62 (1990) ................................................ 28

*R. W. v. Columbia Basin College,*
842 F. App'x 153 (9th Cir. 2021) ................................................................ 3

*Shackelford v. Shirley,*
948 F.2d 935 (5th Cir. 1991) ..................................................................... 17

*Student Gov't Ass'n v. Bd. of Trustees of Univ. of Massachusetts,*
868 F.2d 473 (1st Cir. 1989) ..................................................................... 37

*Tarasoff v. Regents of Univ. of California,*
17 Cal.3d 425, (1976) ............................................................................... 23

*Thunder Studios, Inc. v. Kazal,*
13 F.4th 736 (9th Cir. 2021) ...................................................................... 18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ........................................................................... *Passim*

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC,*
583 U.S. 387 (2018) .................................................................................. 16

*USPS Bd. of Governors v. Aikens,*
460 U.S. 711 (1983) .................................................................................. 28

*Vega v. Tekoh,*
597 U.S. 134 (2022) .................................................................................. 22

*Virginia v. Black,*
538 U.S. 343 (2003) .............................................................................. 17, 20

*Volk v. DeMeerleer,*
187 Wash. 2d 241 (2016) .......................................................................... 23

*Waterkeeper All. v. United States EPA,*
140 F.4th 1193 (9th Cir. 2025) ................................................................. 26

*Wynar v. Douglas Cnty. Sch. Dist.,*
728 F.3d 1062 (9th Cir. 2013) .................................................................. 32

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (9th Cir. 2021) ........................................................ 14, 24, 26

**Statutes**

28 U.S.C. § 1291 ................................................................................ 4

28 U.S.C. § 1331 ................................................................................ 4

42 U.S.C. § 1983 ....................................................................... *Passim*

Wash. Rev. Code § 71.05.020 ........................................................... 1

Wash. Rev. Code § 71.05.150 ........................................................ 1, 6

**Rules**

Rule 12(b) ....................................................................................... 19

**Other**

Allison L. Almason, *Personal Liability Implications of the Duty to Warn Are Hard Pills to Swallow: From Tarasoff to Hutchinson v. Patel and Beyond*, 13 J. Contemp. Health L. & Pol'y 471 (1997).......................................... 23

First Amendment ..................................................................... *Passim*

Fifth Amendment ............................................................................ 2

## I.   INTRODUCTION

> [W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. … Questions have been asked about how teachers or administrators could have missed telltale "warning signs," why something was not done earlier and what should be done to prevent such tragedies from happening again."

*LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001).

R.W. was a nursing student at Columbia Basin College in 2017 when he told a designated crisis responder[1] about repeated and uncontrolled homicidal ideation involving three of his instructors that was triggered by his anger at receiving poor grades and feedback from his instructors. Specifically, he had visions of setting his instructors' offices on fire and attacking them from behind with a saw. His disclosure prompted the designated crisis responder to initiate Washington's duty to warn process. The designated crisis responder did so to ensure Columbia Basin College was aware of the risk of violence R.W.'s homicidal ideation represented to members of the college community. After being placed on notice, the College temporarily issued a trespass notice barring

---

[1] In Washington, a designated crisis responder is a mental health professional appointed by the county or an entity appointed by the county to perform various duties, including evaluations of individuals who present a likelihood of serious harm or are gravely disabled, and to petition for their involuntary commitment where appropriate. *See* Wash. Rev. Code § 71.05.020 (17); Wash. Rev. Code § 71.05.150.

1

R.W. from campus and initiated a student conduct investigation, which culminated in a conditional plan for R.W. to return to his college nursing program.

R.W., however, chose not to engage in the conditional plan for his return. Instead, he filed suit against the College and various college administrators. Years of litigation and appeals ensued. Eventually, R.W.'s claims were whittled down to a single remaining claim for prospective injunctive relief based on his allegation of First Amendment retaliation, which the district court properly dismissed.

As the district court correctly found, R.W.'s expression of homicidal ideation was not protected speech, but a true threat. It was objectively reasonable for the College to interpret the expression as an intent to harm or assault members of the college community in an on-campus setting. Moreover, R.W. failed to prove a retaliatory animus motivated any of the actions taken by the College. The witness testimony and exhibits admitted at trial demonstrated instead that the College was motivated by a reasonable, ongoing desire to mitigate a specific, identifiable, and credible threat of violence – not by an animus towards R.W.'s exercise of any right to speech.

2

Even if R.W. had satisfied the protected-speech and but-for causation elements (which he did not), his First Amendment claim would fail because the College's actions were constitutionally permissible to regulate student speech that invades the rights of other students and school staff to bodily safety on campus. R.W.'s homicidal ideation represented an identifiable and credible threat of violence to members of the college community and satisfied the student speech doctrine's substantial disruption test.

R.W.'s appeal of the district court's rulings should be rejected wholesale for two primary reasons.[2] First, the legal analysis he offers is flawed. He relies on generalized First Amendment principles to criticize the district court's legal conclusions regarding the true threat doctrine and the court's application of the student speech doctrine's substantial disruption test to the college setting. But the general principles he relies upon fail to demonstrate that the legal analysis of

---

[2] Because R.W.'s substantive arguments for reversal lack merit, so does his argument that personal bias of the district court judge or unusual circumstance justify reassignment on remand. *See* Opening Br. at 39. Nor is reassignment justified by the district court's decision to vacate a prior summary judgment ruling, as R.W. suggests. Opening Br. at 39. The currently assigned district judge had the benefit of hearing the evidence presented during a six-day jury trial before it decided to vacate the interlocutory summary judgment ruling of an earlier district court judge – a summary judgment ruling this Court had already partially reversed on other grounds. *See R. W. v. Columbia Basin Coll.,* 842 F. App'x 153 (9th Cir. 2021).

the district court was erroneous in the context of identifiable and credible threats of violence. Second, even if R.W.'s legal analysis was correct, his appeal would still fail. The district court made unchallenged factual findings that prevent R.W. from satisfying his burden even under the (erroneous) legal framework he proposes. On appeal, R.W. has not assigned error to the district court's summary of the evidence (1-ER-8-71) or argued that its findings of fact (1-ER-72-97) were clear error.

This Court should affirm the district court's dismissal of R.W. First Amendment retaliation claim in its entirety.

## II.     JURISDICTIONAL STATEMENT

The district court held original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and this Court now enjoys jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## III.    ISSUES PRESENTED

1. Whether the district court properly decided R.W.'s expression of homicidal ideation constituted an unprotected true threat under the First Amendment where it was objectively reasonable for college administrators to interpret his statements to a designated crisis responder as a serious expression of intent

4

to harm or assault.

2. Whether the district court properly found that no retaliatory animus existed where the district court identified specific witness testimony and exhibits to support its finding and R.W. has not demonstrated the finding was clear error.

3. Whether the district court properly determined the student speech doctrine's substantial disruption test precludes R.W.'s First Amendment retaliation claim where R.W.'s homicidal ideation posed an identifiable and credible threat of violence to the college community and the steps taken to mitigate the threat of violence were reasonable.

## IV.   STATEMENT OF THE CASE

### A.   Substantive Facts

In 2017, R.W. was a student in Columbia Basin College's nursing program. 1-ER-13. On March 6, 2017, he met with his primary care provider, Dr. Michael Cabasug, and disclosed he was experiencing intrusive thoughts about hurting others. 1-ER-22-23. Dr. Cabasug noted that R.W. had a plan to act on his homicidal ideations for about one week. 1-ER-23. Dr. Cabasug realized an intervention was necessary and called for a designated crisis responder (DCR). 1-ER-23.

5

DCR Araceli Perez came to Dr. Cabasug's clinic to evaluate whether R.W. needed to be involuntarily committed under the Involuntary Treatment Act. 1-ER-24; Wash. Rev. Code § 71.05.150 During the DCR's evaluation, R.W. reported he had been doing well prior to his 2017 return to school but had become overwhelmed after returning to the nursing program. 1-ER-24. R.W. related the onset of his homicidal thoughts to receiving poor grades and feedback from his instructors. 1-ER-24. He reported first experiencing homicidal ideation a week earlier and stated that he had thoughts of setting specific instructors' offices on fire or attacking the same instructors from behind with a saw. 1-ER-25. DCR Perez believed R.W.'s ability to identify specific instruments of harm was the beginning of a plan. 1-ER-25. DCR Perez determined R.W.'s homicidal ideation required immediate intervention and informed R.W. that if he refused to go to inpatient treatment voluntarily, she would seek to have him involuntarily committed. 1-ER-25-26. R.W., having little choice, agreed to admit himself for treatment voluntarily. 1-ER-26.

DCR Perez informed R.W. she was a mandated reporter and had a duty to warn law enforcement and the identified potential victims about what she had learned from his evaluation. 1-ER-26. (Laurie Schoffstall, a mental health counselor who performed R.W.'s inpatient intake, also independently concluded

6

that R.W.'s statements triggered a duty to warn. 1-ER-28-30.) Accordingly, DCR Perez initiated the duty to warn process by calling law enforcement and by unsuccessfully attempting to reach Columbia Basin College directly. 1-ER-27.

The next day, the Pasco Police Department reached the College and warned it about R.W.'s expressions of homicidal ideation. 1-ER-31. The warning was eventually advanced to Ralph Reagan, the College's Assistant Dean for Student Conduct. 1-ER-32. Assistant Dean Reagan understood the warning to be part of the duty to warn process. 1-ER-32. This signaled a serious concern for the safety of the college community. 1-ER-32.

Officer Erik Noren of the Richland Police Department spoke directly with DCR Perez on March 7, 2017. 1-ER-30-31. Officer Noren then went to the College's Richland campus to meet with the instructors R.W. identified as the subjects of his homicidal ideation. 1-ER-34-36. Specifically, Officer Noren spoke with Kim Tucker, the Director of the College nursing program, and instructors Valerie Cooke, and Alma Martinez. 1-ER-11, 1-ER-25, 1-ER-34-37. Each instructor took R.W.'s expressions of homicidal ideation as a threat, either personally or to the school. 1-ER-35-37. Tucker felt blindsided and unsafe. 1-ER-35. Cooke was so frightened that she began driving a different car, asked

family members to stay with her, and sought an escort to and from her work parking lot. 1-ER-36.

Assistant Dean Reagan issued an interim trespass notice to R.W. on the same day that law enforcement warned the College. 1-ER-33. The trespass notice precluded R.W. from returning to the College while it pursued a student conduct investigation. 1-ER-33-34, 1-ER-40-41. The trespass notice was delivered to R.W. at the in-patient facility where he was admitted for treatment to address his homicidal ideation. 1-ER-34. The trespass notice was a temporary measure to protect the identified instructors and the College in general. 1-ER-33-34. Kim Tucker, on behalf of the nursing program, drafted a letter to dismiss R.W. from the nursing program. 1-ER-43. However, Assistant Dean Reagan, upon learning of the dismissal letter, intervened. 1-ER-43. Mr. Reagan's intervention forced the nursing program to abandon its intended response in favor of the trespass notice and student conduct investigation processes Mr. Reagan was overseeing. 1-ER-41, 1-ER-43-44.

R.W. appealed the interim trespass notice on March 8, 2017. 1-ER-40. He was still an inpatient at that time. 1-ER-40. The next day, R.W. sought to leave the inpatient facility against medical advice. 1-ER-45. This necessitated another evaluation by DCR Perez. 1-ER-45. DCR Perez believed R.W. was now

minimizing his prior symptoms and providing answers that were inconsistent with answers given in his prior evaluation. 1-ER-45. She was successful in convincing R.W. to remain an inpatient and another involuntary commitment was again avoided. 1-ER-45. However, DCR Perez recommended R.W. be closely monitored upon his discharge to ensure he followed through with treatment recommendations. 1-ER-45. R.W. was discharged on March 10, 2017.

R.W.'s appeal of the interim trespass notice was initially considered by the College's Student Appeals Board on March 13, 2017. 1-ER-47. The Board affirmed the trespass decision. 1-ER-47. Classes for Winter Quarter 2017 concluded on March 17, 2017, with final exams scheduled to occur between March 21 and March 23. 1-ER-49. On March 22, 2017, R.W. appealed the trespass notice directly to interim President Lee Thornton. 1-ER-50. President Thornton upheld the trespass decision on April 19, 2017. 1-ER-57-59. In doing so, he modified the conditions of the trespass notice to allow R.W. to return to the Pasco campus for administrative purposes but kept in place the requirement that R.W. coordinate any return to the Richland campus (where the nursing program was located) through Assistant Dean Reagan. 1-ER-58-59.

The student conduct investigation began on March 22, 2017, with an initial meeting between R.W., his attorney, and Mr. Reagan. 1-ER-52. The

investigation concluded on April 20, 2017, with Mr. Reagan having gathered information from (1) an interview of R.W., (2) R.W.'s treatment records, (3) discussion with R.W.'s inpatient and outpatient mental health providers during a conference call, and (4) a letter provided by Dr. Cabasug. 1-ER-52-57. Ultimately, Mr. Reagan concluded that R.W. had violated the Student Conduct Code by creating a hostile or intimidating environment, whether R.W. intended to do so or not. 1-ER-59. Mr. Reagan's conclusion was guided by the seriousness of R.W.'s episode of homicidal ideation and the lack of assurances from treating providers that R.W.'s homicidal ideation would not return once R.W. returned to the rigors of the nursing program. 1-ER-61. Based upon his finding, Mr. Reagan imposed conditions for R.W.'s return to the nursing program. 1-ER-61. The conditions were designed to support R.W.'s successful reintegration into the campus community and nursing program. 1-ER-61, 63.

R.W. appealed Assistant Dean Reagan's decision to the Student Appeals Board. which affirmed the decision. 1-ER-67. R.W. then appealed directly to President Thornton, who denied the appeal on June 12, 2017. 1-ER-68. President Thornton confirmed that R.W. was *not* being expelled, suspended, or unenrolled from the College. 1-ER-68. Instead, President Thornton saw Assistant Dean

10

Reagan's conditions as a path for R.W. to return to the nursing program where he had left off. 1-ER-68.

Although R.W. could have complied with the conditions outlined by Mr. Reagan, 1-ER-71, R.W.'s prior willingness to do whatever it took to complete the nursing program, 1-ER-69, turned oppositional and he chose not to comply with the conditions Assistant Dean Reagan required, 1-ER-71. Instead, he filed this lawsuit. 8-ER-1952-1961.

## B.    Procedural History

In 2018, R.W. brought suit alleging claims for violations of the First Amendment and Fourteenth Amendment pursuant to 42 U.S.C. § 1983; the Washington Law Against Discrimination; the Americans with Disabilities Act; and the Rehabilitation Act. 8-ER-1952-61. The procedural history of this matter includes three separate appeals and a six-day jury trial before the district court held a bench trial on February 3, 2025. 1-ER-3-5, 7-ER-1815-18. The sole remaining claim before the district court was R.W.'s 42 U.S.C. § 1983 First Amendment retaliation claim seeking prospective injunctive relief against Columbia Basin College President Rebekah Woods. 1-ER-3-5.[3] At the College's

---

[3] President Rebekah Woods was substituted as a party for former President Lee Thornton for the prospective injunctive relief brought against President Thortnon in his official capacity. 1-ER-5.

request, which R.W. did not oppose, the district court considered witness testimony and exhibits admitted during the February 2025 bench trial, along with the witness testimony and exhibits admitted during the 2022 jury trial. 1-ER-3-5. On June 16, 2025, the district court entered a 97-page Findings of Fact and Conclusions of Law rejecting R.W.'s First Amendment retaliation claim, 1-ER-3-99, and entered judgment in favor of President Woods, 1-ER-100.

While R.W.'s Notice of Appeal broadly identifies several district court decisions for which review might be sought, 9-ER-2248-49, his opening brief focuses exclusively on issues pertaining to the February 3, 2025, bench trial, Opening Br. at 1-43. Moreover, R.W. has not assigned error to the district court's summary of the evidence (1-ER-8-71) or its findings of fact (1-ER-72-97), including its credibility determinations regarding R.W.'s testimony (1-ER-75-78).

## V.    SUMMARY OF THE ARGUMENT

The district court rejected R.W.'s First Amendment retaliation claim following a bench trial. This Court should affirm that dismissal for the same three independent reasons given by the district court.

First, the district court correctly held R.W.'s expression of repeated, uncontrolled and explicit homicidal ideation regarding three of his college

12

instructors was unprotected speech because the expression represented a "true threat." An expression is a true threat, in the context of a civil claim, when it is objectively reasonable for the listener to interpret the expression as an intent to harm or assault another. Unlike in the criminal context, the subjective intent of the speaker is of no consequence. Here, R.W.'s expression of homicidal ideation (1) required him to immediately receive inpatient treatment, and (2) resulted in direct warnings by law enforcement to the College about the potential threat of violence to specific instructors. This made it objectively reasonable for the College (and other involved professionals) to interpret R.W.'s expressions as credible threats of violence.

Second, the district court correctly found that R.W. failed to satisfy his burden to prove that a retaliatory animus caused any of the alleged adverse actions. The district court's factual finding was grounded in witness testimony and exhibits admitted during the 2022 jury trial and 2025 bench trial. R.W. cannot demonstrate that this finding was clear error. To do so, he would need to demonstrate how the district court's factual finding was illogical, implausible, or without support in the record below. He has not even tried to do so.

Finally, the district court correctly decided that, even if R.W.'s expression of homicidal ideation had been protected speech, and even if R.W had proven a

13

retaliatory animus, the student speech doctrine's substantial disruption test justified the actions taken by the College to mitigate the risk of violence R.W. presented. Although R.W. criticizes the extension of the substantial disruption test to the college setting, he cannot point to any reason the First Amendment would permit a high school administrator to protect the school from an identifiable and credible threat of violence, while at the same time prohibiting a college administrator from taking the same protective measures to prevent a specific threat of violence.

For all these reasons, this Court should affirm the district court's dismissal of R.W.'s First Amendment retaliation claim.

## VI.    STANDARDS OF REVIEW

Appellate review frequently involves challenges to factual findings, conclusions of law, and mixed questions of law and fact. Factual findings are reviewed for clear error. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241-42 (9th Cir. 2021). This means factual findings will not be reversed unless the findings are "illogical, implausible, or without support in inferences from the record." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020). In other words, "if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even

14

if it is convinced it would have found differently." *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002); *see also Kohler . Presidio Int'l, Inc.*, 782 F.3d 1064 at 1068 (9th Cir. 2015); *Lentini v. Cal. Ctr. For the Arts*, 370 F.3d 837 at 843 (9th Cir. 2004)(a district court's findings of fact from a bench trial must be accepted unless the reviewing court is left with a definite and firm conviction that a mistake has been made). Similarly, credibility findings are reviewed for clear error and entitled to special deference. *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1179–82 & n.7 (9th Cir. 2017); *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985); *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002) (trial court's finding that a witness is not credible is entitled to special deference).

In contrast to findings of fact, conclusions of law are reviewed *de novo*. *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 700 (9th Cir. 2018); *see also Asarco LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 865 (9th Cir. 2020). When the issue involves a mixed question of law and fact, an appellate court is required "to break such a question into its separate factual and legal parts, reviewing each according to the appropriate legal standard." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021). Once an issue is reduced as far as practical, the appropriate standard depends upon whether "answering it entails primarily legal or factual

15

work." *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

## VII. ARGUMENT

To recover under § 1983, a plaintiff must prove that "(1) he or she engaged in a constitutionally protected activity; (2) the defendant subjected him or her to adverse action that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the protected activity and the adverse action." 1-ER-72 (citing *O'Handley v. Weber*, 62 F.4th 1145, 1163 (9th Cir. 2023) and *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (holding that a First Amendment retaliation claim requires proof that a retaliatory animus was the but-for cause of an adverse action). Moreover, school administrators are entitled to take appropriate measures to address student speech that represents an identifiable and credible threat of violence without offending the First Amendment. *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706-07 (9th Cir. 2019). Here the district court correctly held that R.W. failed to prove the first and third elements of his First Amendment retaliation claim. More precisely, the court found that R.W. failed to prove his homicidal ideation was a protected activity and that a retaliatory

16

animus caused any adverse action. The district court also correctly held the protective measures taken by the college administrators to respond to the identifiable and credible threat of violence posed by R.W.'s homicidal ideation did not offend the First Amendment.

**A. The District Court Properly Decided R.W.'s Expression of Homicidal Ideation Constituted an Unprotected True Threat Under the First Amendment**

It is well-established that true threats fall outside of the scope of First Amendment protection. *Virginia v. Black,* 538 U.S. 343, 359 (2003). This principle is rooted in the notion that "[a]s speech strays further from the values of persuasion, dialogue and free exchange of ideas the first amendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts" the speech loses its constitutional import. *Shackelford v. Shirley,* 948 F.2d 935, 938 (5th Cir. 1991).

The district court correctly determined that R.W.'s expression of homicidal ideation represented a true threat. 1-ER-72-78. The court properly applied an objective standard in reaching this conclusion and rejected the idea that a subjective standard is also required. 1-ER-72-78. The court relied on specific passages from witness testimony and exhibits to support its factual findings. 1-ER-72-78. R.W. attacks the district court's decision by (1) arguing

17

the district court applied an incorrect legal standard and (2) offering his own personal view of the evidence presented. Opening Br. at 31-36. Neither argument merits a reversal of the district court.

### 1. The district court applied the correct legal standard for a true threat analysis in a civil case

"The 'true' in [true threats] distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow . . . ." *Counterman v. Colorado,* 600 U.S. 66, 74, (2023) (internal citations omitted). In civil cases, courts apply an objective test to determine if the speech constitutes a true threat. *Boquist v. Courtney*, 32 F.4th 764, 781 n.6 (9th Cir. 2022) ("In criminal cases, *in addition* to applying an objective test, we apply a 'subjective test' and ask whether the speaker subjectively intended to threaten violence.") (emphasis added); *but see Thunder Studios, Inc. v. Kazal,* 13 F.4th 736, 746 (9th Cir. 2021) (observing the Ninth Circuit has not yet expressly determined whether the subjective requirement of a true threat analysis applies in civil cases, "or whether the objective test remains the sole test"). Under the objective test,

> "speech is a true threat if it was reasonably foreseeable 'that the statement would be interpreted by those to whom the [speaker] communicate[d] the statement as a serious expression of intent to harm or assault.'"

1-ER-72-73 (citing *Boquist*, 32 F.4th at 781); *see also O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (applying only the objective test to a civil suit for alleged First Amendment violations).

In *O'Brien v. Welty*, a Fresno State student involved in political advocacy was an outspoken critic of the university's administration. The student read what he considered an offensive poem in a supplement to the student newspaper published by the Chicano and Latin American Studies Department ("CLS"). *O'Brien*, 818 F.3d at 924. The student videotaped himself confronting the CLS faculty advisor and another faculty member in their respective offices. *Id.* The confrontation ended with both faculty members refusing to speak with the student and calling the campus police department. *Id.* Following a student conduct proceeding, the student conduct officer recommended disciplinary sanctions against the student and the university's vice president followed the recommendation and imposed sanctions. *Id.* at 927.

The student sued, alleging in relevant part, a violation of his First Amendment rights. *Id.* at 928. On appeal from dismissal of the student's claims under Rule 12(b), this Court reviewed whether the discipline imposed by the university violated the student's First Amendment rights. *Id.* at 929-32. In so doing, unlike in decisions from the criminal arena analyzing the subjective intent

of the speaker, this Court applied an objective test focusing on the perspective of the party hearing the message. *Id.* at 932. This Court found that the university vice president and faculty reasonably could find the student's behavior to be intimidating and harassing and were concerned for their safety. *Id.*

This Court further held that the vice president construed university policy "as forbidding conduct that could reasonably be understood as threatening, irrespective of the subjective intent" of the student. *Id*. (comparing true threat criminal cases like *Elonis v. United States*, 575 U.S. 723 (2015) and *Virginia v. Black*, 538 U.S. 343, 359). This Court noted that faculty "do not generally expect to be confronted without warning by a student asking hostile questions and videotaping" and may "reasonably become concerned for his or her safety" if the "uninvited student refuses to cease hostile questioning and refuses to leave a professor's personal office after being requested to do so." *Id.* The Court concluded the student's conduct described in the complaint "could be considered 'harassment' or 'intimidation' and threatening under an objective reasonableness standard" and that it was therefore "permissible for Fresno State to impose discipline" on the student under the university's "reasonable and viewpoint-neutral regulation." *O'Brien*, 818 F.3d at 932 (emphasis added). Thus, this

20

Court's reasoning in *O'Brien* supports the use of a test that focuses on a purely objective standard in the context of civil litigation.

R.W.'s argument criticizing the lack of a subjective standard (Opening Br. at 33-34) is inapposite. He improperly relies on criminal cases where the State must prove intent. *See, e.g.*, Opening Br. at 33-34 (citing *Counterman*, 600 U.S. at 69). *Counterman* helps illustrate this point. In *Counterman*, the petitioner was convicted of stalking and harassment. In that context, the Supreme Court explained that where the State must prove *mens rea* for a criminal charge, a subjective mental state must be established, i.e. "that the defendant had some subjective understanding of the threatening nature of the speech." *Id.* at 69. Imposing the requirement to prove a subjective mental state effectively shields some true threats from criminal liability because of the difficulties in proving a mental state. *Id.* at 75. However, this is tolerated in criminal proceedings to prevent the criminal justice system from being used to chill speech. *Id.* The same interests simply do not apply when an individual is seeking to extract money damages from the government. Nothing in the *Counterman* opinion extends the subjective requirement to the civil context, and doing so would be inconsistent with the Court's recognition that "a statement can count as such a threat based solely on its *objective* content." *Id.* at 72 (emphasis added).

21

R.W.'s argument to extend the criminal *mens rea* requirement to civil cases also misses another fundamental distinction between the two types of proceedings: in a criminal matter the government seeks to impose punishment, but in a §1983 matter an individual seeks to extract money damages from the government. In other contexts, this difference has precluded the extension of criminal law principles to civil lawsuits. For example, the lack of proper *Miranda* warnings cannot serve as the basis for a civil suit, and the exclusionary rule does not prohibit the admission of evidence in civil lawsuits. *Compare Vega v. Tekoh*, 597 U.S. 134, 152 (2022) (noting "a violation of *Miranda* is not itself a violation of the Fifth Amendment" and finding "no justification for expanding *Miranda* to confer a right to sue under § 1983") *with Lingo v. City of Salem,* No. 14-35344, 2016 U.S. App. LEXIS 14535 (9th Cir. 2016) (holding the exclusionary rule does not apply in §1983 claims for money damages). R.W. offers no good reason to extend a *mens rea* requirement to a true threat analysis in a civil case in which a plaintiff is seeking to extract damages.

R.W.'s arguments also rely on several cases that generally discuss protections for physician-patient communications. *See* Opening Br. at 31-32. None involves the circumstances presented here – identifiable and credible threats of violence. *See* Opening Br. at 31-32; *Conant v. Walters*, 309 F.3d 629

22

(9th Cir. 2002) (involving an investigation of a physician based upon physician's speech regarding medical marijuana). In cases that involve identifiable and credible threats of violence, courts reach different conclusions than R.W. suggests. For example, it is well-established that when a health care provider believes a patient presents a risk of physical harm to another, the physician-patient communication is not protected; rather, the provider has a duty to warn the person who is at risk. *See e.g., Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 435, 551 P.2d 334 (1976); *Petersen v. State*, 100 Wash. 2d 421, 671 P.2d 230 (1983) (statutory privilege); *Volk v. DeMeerleer*, 187 Wash. 2d 241, 386 P.3d 254 (2016); *see also* Allison L. Almason, *Personal Liability Implications of the Duty to Warn Are Hard Pills to Swallow: From Tarasoff to Hutchinson v. Patel and Beyond*, 13 J. Contemp. Health L. & Pol'y 471, 479–480 (1997).

For all these reasons, this Court should affirm the district court's use of an objective "true threat" test and decline to require a *mens rea* element in the context of §1983 claim.

### 2. R.W. has failed to demonstrate the district court's factual findings constitute clear error

The district court's finding that a reasonable person would have foreseen

that R.W.'s descriptions of repeated and uncontrolled thoughts of killing three college instructors would be interpreted by those who heard his expressions as a serious expression of intent to harm or assault is supported by substantial evidence. 1-ER-73-78. R.W. does not argue otherwise.

Whether a particular statement is a "true threat" is a question for the finder of fact and is evaluated based on the "entire factual context, including the surrounding events and reaction of the listeners." *Corales v. Bennett*, 567 F.3d 554, 564 (9th Cir. 2009) (internal quotations omitted). Following a bench trial, a judge's findings are reviewed for clear error. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241-42 (9th Cir. 2021). Accordingly, "if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Husain*, 316 F.3d at 835.

R.W. does not even attempt to satisfy the clear error standard, nor could he. The record is replete with witness testimony and documents that support the district court's findings regarding the relevant events. This includes, but is not limited to, the following evidence cited by the district court: (1) R.W. expressed recurring thoughts of killing three of his instructors by fire or saws; (2) R.W. admitted that his homicidal ideation was uncontrolled, intrusive, and very

frightening; (3) R.W.'s homicidal ideation was triggered by his anger at receiving poor grades and feedback from his instructors; (4) R.W.'s primary care provider believed an evaluation by a designated crisis responder was necessary; (5) the designated crisis responder concluded R.W. posed a threat to others and would have sought to have R.W. involuntarily committed had he refused voluntary inpatient treatment; (6) the designated crisis responder believed she had a duty to warn the instructors who were the focus of R.W.'s homicidal ideation; (7) another mental health professional who worked with R.W. also believed a duty to warn existed; (8) R.W.'s wife took the protective measure of hiding his firearms; and (9) the targeted instructors feared for their safety. 1-ER-24-26, 1-ER-30, 1-ER-35-37, 1-ER-73-74, 1-ER-77-78. Further, the district court gave "limited weight and credibility to R.W.'s testimony, particularly his testimony about the nature and seriousness of his homicidal ideations …." 1-ER-75-78 (explaining in detail the significant inconsistencies in R.W.'s testimony).

Tellingly, R.W.'s opening brief does nothing to explain why clear error exists. Opening Br. at 31-36. The only time R.W. mentions clear error is in reference to a separate ruling on a motion for reconsideration that he does not directly challenge on appeal. Opening Br. at 40-42. R.W. is precluded from attempting to challenge the district court's factual findings in his reply. *See*

*Waterkeeper All. v. United States EPA*, 140 F.4th 1193, 1213-14 (9th Cir. 2025) (observing the Ninth Circuit does not generally consider issues not raised and developed in a party's opening brief). Accordingly, this Court should affirm the district court's factual finding that R.W.'s speech about his homicidal ideation constituted an unprotected true threat, and that R.W. has failed to prove the protected-speech element of his First Amendment claim.

## B. The District Court Properly Found that No Retaliatory Animus Existed

Because the district court grounded its no-animus finding in specific testimony and exhibits, and R.W. fails to identify any clear error, that finding should be upheld. A First Amendment retaliation claim requires proof that a retaliatory animus was the but-for cause of an adverse action. *Nieves*, 587 U.S. at 398. Moreover, whether a state actor was motivated by a retaliatory animus is a question of fact, *see Cheairs v. City of Seattle*, 145 F.4th 1233, 1246 (9th Cir. 2025), and such a finding is reviewed under a clear error standard. *Yu*, 15 F.4th at 1241-42. A reversal would be appropriate only where the findings are "illogical, implausible, or without support in inferences from the record." *Oakland Bulk*, 960 F.3d at 613.

Ample witness testimony and exhibits supported the district court's factual finding that R.W. failed to prove the existence of retaliatory animus. 1-

ER-78-86. The district court described its retaliatory animus analysis in reference to the types of adverse actions alleged by R.W.: the interim trespass decision, the student conduct decision, and the collateral effects of both. 1-ER-78-86. Regarding the interim trespass decision, the district court found "Mr. Reagan credibly testified that he intended the interim trespass to be a temporary safety measure that he felt compelled to take given his duties to ensure the safety of the College community," 1-ER-78, and that Mr. Reagan's action to protect R.W. from expulsion from the nursing program proved a lack of retaliatory animus, 1-ER-81. Regarding the student conduct decision, the district court found Mr. Reagan's decision and the conditions he imposed were not intended to punish R.W. 1-ER-81. Instead, the decision was grounded in a legitimate concern for R.W.'s continued stability and adherence to his treatment plan. 1-ER-82. The lack of any reasonable guarantee that R.W.'s homicidal ideation would not return, along with R.W.'s self-report that his homicidal ideation felt out of his control, supported Reagan's legitimate concern. 1-ER-83. The district court found that any collateral effects R.W. experienced were the result of his "unwillingness to engage with Mr. Reagan regarding his return to the nursing program, not [the result of the College] staff's animus or retaliatory motive toward R.W.'s speech." 1-ER-83-84. R.W. fails to explain how the district

court's eight-page description of the evidentiary basis for its finding constitutes clear error. 1-ER-79-86; Opening Br. at 36-39. Instead, R.W. discusses the types of action that can constitute adverse actions. Opening Br. at 36-39. This misses the point entirely.

R.W.'s citation to *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) is illustrative. R.W. cites *Rutan* for the proposition that labeling an action as non-punitive does not change the character of the action. Opening Br. at 37-38. This is true. But it does not address what evidence is necessary to prove retaliatory animus existed. An adverse action and the animus that motivates it are separate elements entirely. *See O'Handley,* 62 F.4th at 1163 (describing the elements of a First Amendment retaliation claim). Accordingly, R.W.'s argument fails to explain how the district court's finding that no retaliatory animus existed is clear error.

R.W.'s confusion appears to arise from his reliance on cases like *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) that concerned standards applicable at the summary judgment stage. Opening Br. at 37; *Coszalter*, 320 F.3d at 977. The summary judgment burden shifting analysis described in *Coszalter* does not apply once a case proceeds to trial, as this matter did. *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (describing in a Title VII

28

case how once a matter proceeds to trial the summary judgment, burden shifting analysis drops from the case). Accordingly, *Coszalter* offers no aid in determining whether the evidence presented at trial is sufficient to sustain a finding that no discriminatory animus existed.

For these reasons, this Court should uphold the district court's factual finding that R.W. failed to satisfy his burden at trial of proving a retaliatory animus motivated any adverse action.

### C. The District Court Properly Determined the Student Speech Doctrine's Substantial Disruption Test Precludes R.W.'S First Amendment Retaliation Claim

Since R.W.'s homicidal ideation presented an identifiable and credible threat, the district court correctly applied the "substantial disruption" test to reject his First Amendment retaliation claim. "Under *Tinker* [*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)], schools may restrict speech that 'might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and to be let alone.'" *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 710 (9th Cir. 2019) (internal citations omitted). As a threshold matter, R.W. offers no opposition to the idea that the student speech doctrine's substantial disruption test applies to identifiable and credible threats

29

of violence. *See* Opening Br. at 18-30. Nor could he. The district court cited at least five binding cases where this Court applied the test to threats of violence in schools. 1-ER-89-91. Instead, R.W. argues the substantial disruption test should not be extended to the college setting, and even if it is, the evidence admitted during the trial is insufficient to support the district court's findings. Opening Br. at 18-30. Should this Court choose to reach the student speech issue, it should affirm the district court's application of the student speech doctrine's substantial disruption test to the college setting and its findings of fact because R.W.'s arguments to the contrary lack merit.

**1. The district court properly concluded that the student speech doctrine's substantial disruption test applies to college campuses when identifiable and credible threats of violence exist**

The district court properly applied the substantial disruption test to the college setting, recognizing that "[p]rimary, secondary, and postsecondary schools alike have a similar, strong interest in regulating speech that invades the rights of its students and staff to bodily safety on campus." 1-ER-95. The district court further recognized the traditional reasons for limiting the student speech doctrine to primary and secondary settings simply do not apply here. 1-ER-94-95. Namely, factors like emotional maturity, pedagogical structure, academic sophistication, and academic freedom that justify a higher tolerance of

30

controversy cannot justify inaction in the face of an identifiable and credible threat of physical violence against members of a college community. 1-ER-94-95. R.W.'s arguments to the contrary are misguided.

### a. R.W. relies on inapposite cases to attack the district court's conclusion

R.W. erroneously relies on general principles rather than engaging with the district court's specific reasoning. Specifically, he relies on general principles from various First Amendment cases to challenge the application of the substantial disruption test to the college setting. In doing so, he overlooks how easily those cases are distinguished because they come from different types of student speech cases.

A proper analysis starts by recognizing that the student speech doctrine treats student speech differently depending upon the context in which it arises. As this Court has previously observed,

> The [Supreme] Court has decided four lead student speech cases … Each governs a different area of student speech: "(1) vulgar, lewd, obscene, and plainly offensive speech" is governed by *Fraser* [*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986)]*;* "(2) school-sponsored speech" is governed by *Hazelwood* [*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)]*,* and "(3) speech that falls into neither of these categories" is governed by *Tinker*. *Chandler v. McMinnville Sch. Dist.,* 978 F.2d 524, 529 (9th Cir.1992). In *Morse* [*Morse v. Frederick*, 551 U.S. 393 (2007)]*,* the Court dealt with a fourth, and somewhat unique, category—

speech promoting illegal drug use. 551 U.S. at 403, 127 S. Ct. 2618.

*Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1067 (9th Cir. 2013). Despite this clear delineation in case law, R.W. frequently relies on general principles from categories of student speech cases that did not involve identifiable and credible threats of violence. For example, R.W. relies on *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973). Opening Br. at 18-20.

In *Papish*, the Supreme Court was concerned with discipline imposed on a student journalist for an indecent newspaper publication. *Papish*, 410 U.S. at 667-68. The Court held the "mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. Thus, *Papish* falls within the *Fraser* category of the student speech doctrine. It says nothing about whether *Tinker's* "substantial disruption" framework should apply in a college setting when identifiable and credible threats of violence exist.

Another example is R.W.'s reliance on *Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir. 2015). Opening Br. at 21. As the district court noted, the *Oyama* court "focused on the prongs of the student speech doctrine concerning vulgar speech, speech promoting illegal conduct, and speech bearing the school's 'imprimatur'" and "did not involve expressions of violent ideations

32

against college staff or students." 1-ER-93-94. In that factual context, the *Oyama* court analyzed the issue under the *Hazelwood* framework, which governs school-sponsored speech, not the substantial disruption test under *Tinker*. *Oyama*, 813 F.3d at 861-64. Importantly, *Oyama* also did not categorically reject applying principles of the student speech doctrine to the college setting. On the contrary, the court specifically acknowledged that principles from the student speech doctrine, in the right circumstance, could apply to the college setting. *Id.* at 861-62 ("This institutional responsibility, like the 'governmental interest in stopping student drug use' in *Morse,* may allow the University to deny a student teaching application based upon speech demonstrating that the applicant lacks the professional skills and disposition to enter a classroom, even as a student teacher.") Accordingly, *Oyama* does not help R.W.'s cause.

R.W. also misreads the import of cases where a substantial disruption test was considered in the context of a college setting. The primary example of this is R.W.'s reading of *Healy v. James*, 408 U.S. 169 (1972). Opening Br. at 22-25. In *Healy*, Central Connecticut State College, through its president, refused to recognize a local chapter of the Students for a Democratic Society. 408 U.S. at 171-175. The aggrieved local chapter sought relief in federal district court, and the case eventually reached the Supreme Court. *Id.* at 180. In the most

33

relevant part of the opinion, the Supreme Court cited *Tinker* for the proposition that:

> In the context of the 'special characteristics of the school environment,' the power of the government to prohibit 'lawless action' is not limited to acts of a criminal nature. Also prohibitable are actions which 'materially and substantially disrupt the work and discipline of the school.' *Tinker v. Des Moines Independent Community School District*, 393 U.S., at 513, 89 S. Ct., at 740. Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.

*Healy*, 408 U.S. at 189. Ultimately, the Supreme Court ruled that "[t]he [factual] record, however, offers no substantial basis" for the university's conclusion that recognizing a chapter of Students for a Democratic Society would materially and substantially disrupt the work or discipline of the school. *Id.* at 190. Thus, contrary to R.W.'s reading of *Healy*, the Supreme Court expressed its willingness to consider the substantial disruption test in a college setting. *See Hunt v. Bd. of Regents of Univ. of New Mexico*, 792 Fed. Appx. 595, 602 (10th Cir. 2019) ("Three years later, the [Supreme] Court extended *Tinker* to the university setting, although that case concerned official recognition of a student group and not student discipline.").

34

For these reasons, none of the cases relied upon by R.W. undermines the district court's application of the student speech doctrine's substantial disruption test to the college setting when identifiable and credible threats of violence exist.

### b. The weight of authority favors applying the substantial disruption test in the college setting

In the context of specific threatening speech, the weight of authority favors applying the substantial disruption test to the college setting. *Contra* Opening Br. at 21-22. In *Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018), the Eleventh Circuit applied *Tinker* in a university setting when a nursing student made unwanted advances and sent disturbing text messages to a fellow student. *Id*. at 1227. Specifically, the Eleventh Circuit found that *Tinker* applied and focused on the Supreme Court's holding that public schools may regulate student speech "when it impinges upon the rights of other students to be secure and to be let alone." *Id*. at 1229. In *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016), a college student filed a § 1983 action alleging the college violated his right to free speech when it removed him from the nursing program for unprofessional conduct. The Eighth Circuit cited *Tinker,* holding it "permits disciplining public school students for off-campus postings 'where it is reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting.'" 840 F.3d at 531, n.6.

District courts have reached similar holdings. In *Doe v. Rector & Visitors of George Mason University*, 132 F. Supp. 3d 712, 730 (E.D. Va. 2015), the district court in the Fourth Circuit applied *Tinker* to a First Amendment claim by a college student challenging his expulsion from campus for misconduct. In *Castle v. Marquardt*, 632 F. Supp. 2d 1317, 1335-36 (N.D. Georgia 2009), a district court in the Eleventh Circuit applied the *Tinker* analysis to a First Amendment claim by a college nursing student suspended from a nursing program. In *Murakowski v. University of Delaware*, 575 F. Supp. 2d 571, 591 (D. Del. 2008), a district court in the Third Circuit applied the *Tinker* analysis to a First Amendment claim by a college student who had been disciplined for posting allegedly threatening statements on the college's website.

In contrast, the cases relied upon by R.W. do not deal with specific threats to the rights of others. Opening Br. at 22. For example, *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386 (4th Cir. 1993), involved an "ugly woman contest" that the court described as a "crude attempt at entertainment." *IOTA XI*, 993 F.2d at 389. The Court was concerned with whether "the skit performed by Sigma Chi [came] within the constitutionally protected rubric of entertainment." *Id.* at 390. That case, like every other case relied upon by R.W., did not involve an identifiable and credible threat of

violence. *See, e.g.*, *DeJohn v. Temple Univ.,* 537 F.3d 301, 305 (3d Cir. 2008) (involving a claim by a student that an overbroad sexual harassment policy chilled his speech related to the service of women in the military); *Kincaid v. Gibson,* 236 F.3d 342, 348 (6th Cir. 2001) (involving a claim by a student that the confiscation of a yearbook violated her free speech rights); *Student Gov't Ass'n v. Bd. of Trustees of Univ. of Massachusetts,* 868 F.2d 473, 480 (1st Cir. 1989) (involving a claim that disbanding a university legal services office violated the First Amendment).

The weight of authority favors the extension of the student speech doctrine's substantial disruption test to the college setting in the case of identifiable and credible threats of violence.

> **2. The district court correctly determined that the evidence at trial satisfied the requirements of the substantial disruption test**

This Court should refuse R.W.'s request to reverse the district court's factual findings regarding the substantial disruption test. As described *supra,* "if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Husain*, 316 F.3d at 835. Here the district court made factual findings that (1) "CBC officials reasonably concluded that [the College] faced a

credible, identifiable threat of violence," (2) the "threat of violence was clearly aimed at the school," (3) the interim trespass was reasonable based upon available information, and (4) the justified concerns for campus safety were ongoing at the time of the student conduct decision. 1-ER-97. R.W. never attempts to explain how these factual findings are not supported by the record below. Opening Br. at 27-30. Instead, he ignores his burden, and claims in conclusory fashion that R.W. was not perceived as a threat at the conclusion of the student conduct investigation. Opening Br. at 30. This claim is wholly inconsistent with the district court's finding that, "Mr. Reagan remained concerned about R.W.'s return to the stress of the nursing program, which had contributed to R.W.'s previous homicidal ideations." 1-ER-61. Given R.W.'s failure to demonstrate clear error, this Court should affirm the district court's finding that the evidence presented at trial satisfied the substantial disruption test.

## VIII. CONCLUSION

For all the reasons discussed herein, this Court should affirm the district court's June 16, 2025, order dismissing R.W.'s First Amendment retaliation claim for prospective injunctive relief in its entirety.

38

RESPECTFULLY SUBMITTED this 30th day of March, 2026.

EVANS, CRAVEN & LACKIE, P.S.

/s/Carl Warring
Carl P. Warring, SAAG
WSBA #27164
Attorney for Respondent

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

The undersigned attorney or self-represented party states the following:

**[X] I am unaware of any related cases currently pending in this court.**

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**DATED** this 30th day of March 2026.

EVANS, CRAVEN & LACKIE, P.S.

/s/Carl Warring
Carl P. Warring, SAAG
WSBA #27164
Attorney for Respondent

40

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

I am the attorney or self-represented party.

**This brief contains 8,258 words,** including 8,258 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

**[X] complies with the word limit of Cir. R. 32-1.**

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

41

[    ]   complies   with   the   length   limit   designated   by   court   order   dated

_____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

     **DATED** this 30th day of March 2026.

                EVANS, CRAVEN & LACKIE, P.S.

                /s/Carl Warring_____
                Carl P. Warring, SAAG
                WSBA #27164
                Attorney for Respondent

42

## PROOF OF SERVICE

I certify that I electronically filed the above document on March 30, 2025, with the Clerk of the Court using the ACMS system which will send notification of such filing to the following:

Bret Uhrich
Abigail Cybula
Eric Eisinger

Email:      buhrich@walkerheye.com
Email:      acybula@walkerheye.com
Email:      eesinger@walkerheye.com

EVANS, CRAVEN & LACKIE, P.S.

BY:    s/Carl P. Warring
CARL P. WARRING, WSBA #27164
818 W. Riverside Avenue, Suite 250
Spokane, WA 99201
(509) 455-5200
Cwarring@ecl-law.com
*Attorney for Defendants-Appellees*

43